Good morning, Your Honours. May it please the Court, my name is Ashley Gamborian and I represent Ms. Karine Movsesyan, the petitioner in this case. This case is about the credibility finding by an immigration judge and that credibility finding is not supported by substantial evidence. He found some inconsistencies in Ms. Movsesyan's testimony with her written declarations, declarations and he explained that his inconsistencies went to the heart of her claim. However, a review of the entire record reveals that there are no inconsistencies. This Court has held on several occasions that an immigration judge cannot cherry pick solely certain facts favoring an adverse credibility finding and ignoring facts that undermine that result. This is what the immigration judge did in this case. Ms. Movsesyan submitted some documents in support of her claim. And those documents, I think in her appeal to the BIA, Movsesyan suggested she wasn't aware that the documents were fraudulent but seemed to concede that they were in fact fraudulent. Does she now contend that the analysis in the Consular and Records Reports is incorrect? That's correct, Your Honor. So now she says that they weren't fraudulent? Well, yes, that's exactly what... I mean, but before her position was that she just didn't know they were fraudulent. Well, that's what we argued in our motion to reopen. Well, she always said that she didn't know how these documents were obtained. She had asked a friend to obtain the documents and that friend had asked some other friends to obtain the documents and she never asked them who exactly got the documents and from where because she was afraid for their lives. But what evidence have you presented that they aren't fraudulent? Okay, the document that the immigration judge based his decision only on a State Department letter that was issued by the consular officer who kind of described what the investigation revealed. However, if you look at the document itself, it's not really an investigation report. It's just a summary of somebody going to the local police department and asking whether this document was legal or not. Well, obviously, these people who persecute people on a daily basis, they illegally summon them to police stations. They're not going to verify documents that they issued illegally. So it's the kind of a catch-22 situation where you can't rely on statements like that. The Department of State did exactly that. They went to the local police department. They don't even identify which police department. All right, but you rely on out-of-circuit authorities for the proposition that the BIA improperly relied on these reports. But if Angov versus Holder is the law of the circuit, how can you win? Well, at that time when we briefed the issue, Angov had not been issued. All right, but now if it is the law of the circuit, is that a nail in the coffin? No, I don't think so, Your Honor. Angov was a very harsh decision and it basically it cannot stand for the proposition that all Department of State investigation reports are credible. In Angov, the government had conducted a very thorough investigation. They had identified which police department they went to, which floor they went to, who they talked to. They had gone to the residences where the respondent had alleged he had lived. They had photographed the places. So it looked like American agents had done the job. And in this case, it's totally done based on information provided by the Armenian government. So I think this is totally distinguishable. And if we take Angov as a holding that the proposition that stands for all State Department letters are credible and reliable, then we don't need an immigration judge to assess the value of it. Then we can just say whenever the government submits any letters from the Department of State, whether reliable or not, it's okay. Then the documents are fraudulent. I don't think that this Court should rule in such a way. In this case, actually, this is a pre-Real Idea case, and the judge should have actually taken, looked at the entire evidence. He couldn't have even considered the documents until he assessed Ms. Mosesian's credibility on its own. On the testimony and the totality of the post-traumatic disorder, she was very stressed during the hearing. She had taken medication, self-prescribed medication, but she had taken medication to sedate her so that she could withstand the questioning. And then there was a lot of interpretation problems. So the interpreter over and over said, I can't keep up with them. I can't understand. And the judge didn't even try to address these issues. Once the judge saw the Department of State letter, basically he made up his mind. He said, that's it. She's lying. But he can't do that. He has to take the entire, he relied on inconsistencies, what he called inconsistencies, on what she said about her employment. Or she mentioned in her declaration that there were drugs being sold. And then in her testimony, she referred to these drugs as controlled substance. And when she identified what the controlled substance was, it was ethanol alcohol. She explained that this was ethanol, the ethanol alcohol was in fact the controlled substance. The judge completely ignored that explanation. She provided sufficient evidence and good explanation about all these alleged inconsistencies. And then the judge dismissed all of them. Well, I think that the IJ made, there were, aside from the consular reports, the IJ felt that there were fraudulent medical histories and police reports that Mosessian submitted that related to her past persecution and her future persecution. Also the IJ felt that she failed to offer a satisfactory explanation about her employment dates and the name of the pharmacy and her travel from Armenia. And also that she kind of shifted the description about the contents of the summons, which all of those would go to the heart if believed. And so you the record would have to compel another conclusion. Now, admittedly, there might be other explanations, but does it compel another conclusion? No, Your Honor, it doesn't. Ms. Mosessian explained the employment issue. Well, no, you said, I asked, does it compel? And you said, no, it doesn't compel. If it doesn't compel, you lose. No, no, I misunderstood the court's question. I believe the court asked that if it compels, if there is substantial evidence for the finding, there is no substantial evidence of fraud or any inconsistencies or any incredibility in this case. The judge had just made up his mind. And so he found reason. He relied on the fact that she had said, oh, I stopped in Armenia on my way out. Well, that does not necessarily bolster her claim. So why would she say that if it's not true? So that shouldn't be held against her. And so there were many... Well, that's one way to look at it, but the judge looked at it another way. So if they're both, if, and the judge was the one that was sitting there looking at your So I'm not sure it compels accepting what she says, as opposed to what the trier of fact determined. I mean, that's, that's, I mean, we have to, you know, we have to, we're a step away from it. We're not looking at the witnesses. So it's got to compel as opposed to just, okay, there's two ways we can go. Well, the judge in his decision first started with describing the presumption that she had submitted a fraudulent document. He explained a way he, or he justified his reasons why he thought she lied. But in fact, she didn't because she said the same thing over and over and she provided... Well, just because you raise your voice and you repeat things doesn't make it the truth. My husband's told me that several times, that just, just because I keep repeating it and saying it louder doesn't make me mean I'm right. But so, that, I think the fact that she keeps saying that, you know, you're right about inconsistencies are something that you look for, but, but people can cling to a lie and it doesn't make it true. I'm not sure I understand what the court is asking you. Well, you're saying she, you know, I mean, the IJ didn't feel she was inconsistent. That was part of what, part of the credibility, adverse credibility. But what you're saying is she kept saying it and therefore it makes it true. Well, that doesn't... Well, what I'm saying is that the IJ should have looked at the totality of the evidence, not just certain things. The totality of the evidence was that she provided explanations for even those presumed inconsistencies and he just dismissed them. Do you want to save any time for rebuttal? Uh, I'd like to save three minutes. Okay. So, um, the government has also raised the issue of, um, exhaustion of administrative remedies. I just wanted to mention that, um, we've, when we filed the motion to reopen, we briefed that issue very thoroughly and we explained how this would have affected the, the outcome of the case and the BIA rejected our argument dismissing our, our motion to reopen because they said they had already considered that. So this issue should be considered litigated and now we can raise that on appeal. I'll reserve the rest. Okay. Thank you. Good morning. Good morning, Your Honor. May it please the Court, I'm Lyle Jensler. I'm from the Department of Justice Civil Division, the Office of Office of Litigation, Immigration and Litigation. OIL. Excuse me, OIL. Okay. This is a very straightforward adverse credibility case and the IJ proceeded as did the BIA on two tiers, both inconsistent, inconsistent statements and the fraudulent documents. I'd like to start with the fraudulent documents because they're very interesting. The first thing that we should note is that although the petitioner has complained about the overseas consular report, uh, she has never complained about the forensic report. There's not one instance where she mentions the forensic report, which found the documents were fraudulent, that they had fraudulent, uh, apostles on them. That by itself would show that the documents are fraudulent and she's totally not exhausted any argument as to that. She's never mentioned it. As to the other exhaustion issue, it was never raised in the appeal. The appeal actually to the BIA basically stated they're fraudulent, but she did not know, and it was not raised in the motion to reopen. It was raised in the stay of removal, which is a separate document, and then argued later in a reply brief to the motion to reopen. On those grounds, it wasn't exhausted. Well, if, because, okay, NCOF is law of the circuit presently, but whether that remains or what, all the other circuits have looked at it So if, let's say you can't consider, if it turns out that you can't consider the consular reports, um, is there sufficient evidence to support the IJ apart from that? There is more than sufficient evidence. Can you, can you outline that? All right, well first, I'm not quite sure if this is what you mean, but I would like you to take a look at the two medical reports. I can give you the page sites. Uh, the first one is on AR 522, the second's on 489. Two reports give different dates for when she was hospitalized and broke her elbow. Uh, that... I'm sympathetic because I have a fractured elbow right now. Understood, but on one, she says it happened on October 20th or October 28th. On the other one, it says, oh, the elbow was broken and she was hospitalized in November. How can the reports be accurate if, in fact, they don't even have the same date? But that's not what Your Honor asked. Your Honor asked about the inconsistencies. Well, or what supports it? Take out the consular, fraudulent consular reports. Okay, and that includes the forensic report. All right, the first major inconsistency is how she left Armenia. Uh, she originally stated that she left on November 16th, that she was terrified she was going to be stopped at the airport, that she had to get out. So she took a but I... that's a hard word for us. But at any rate, she took a train there. She stayed in that city for a month with her relatives, then caught a flight to Moscow, then from Moscow came to the United States. The reason she did that was because she was terrified she'd get stopped at the airport. That's what she says in her asylum application. When she testified, she totally changed her story. She said, no, I went to Tbilisi for one day, came back to the capital of... of Armenia and flew out there. I stayed in Moscow, then came to the United States, never intending to stay in the United States. I wasn't... I was unhappy, but it was always my intent to return to Armenia. What happened was, in November of 2001, I received a notice from one of my neighbors in Armenia that the authorities were looking for me to testify against Arkady Vinayan. And that's when... that's when I decided I could not go back. I had to stay there. And if you wish, I have all those sites, but they're in the brief. The problem with that, they're totally inconsistent. We then go to the next inconsistency or implausibility in that she says that happened in November of 2001. That's when the neighbor notified her of this. In September of 2000, the Armenians had dropped all charges against the individual she claimed. He'd left the country. There was nothing remaining. Why then would they be seeking her a year later to testify against him? And yet that's the reason she testified that she was afraid to return to Armenia, that she needed asylum. Just based on those two major inconsistencies, without looking at the consular reports, without looking at the forensic reports, those go to the heart of her claim, which it has to do because it's pre-real ID. And she's got no explanation for it. In fact, when she was asked about this, oftentimes she just hesitated and didn't respond at all. And the immigration judge noted that in his decision. Now she's complained that there were translation errors or there was a problem with the interpreter. She never claimed that in the court. She never raised the issue to appeal to the board. She also says, I was self-medicating on some sort of Russian drugs. But in her testimony to the immigration judge, she said, I took the drugs to calm me down. She never said that they confused her or that they impeded her ability to respond to questioning. She didn't say that in her appeal to the board either. These are all after the fact. Now on to you, on petition to review to you, she's saying that she never claimed any of that, either to the immigration judge or to the board. Now she also says, well, I had post-trauma stress syndrome. There is evidence of that. We concede that she did bring a psychologist, but interestingly, the psychologist never said that that would inhibit her ability, repeat her ability to testify, that it would confuse her. That wasn't any part of her testimony. Moreover, the psychologist was not aware of the fraudulent documents. Now I understand your Honor has asked me to separate those out. I'm just saying that when she made her assessment, she wasn't aware of that. She wasn't aware of the changed dates. So it's there, but does it compel a conclusion that's contrary to what the immigration judge made and what the board affirmed? The answer is no. I mean, obviously this court could disagree. I could disagree. There could be a different interpretation, but that's not the standard of review for this court. The standard of review is, does the evidence compel a contrary conclusion? Now in either case, whether you just look at the inconsistencies that I mentioned, I haven't even talked yet about the employment inconsistencies where she said she was a pharmacist in her asylum application, but then said she was something else when she testified. And we haven't mentioned in the judge, although he footnoted it, did not particularly rely on the fact that she changed the number of assaults that she suffered from her What was the explanation, if any, that she gave to explain the difference between the I-589 and her testimony regarding Tbilisi and Moscow and trains and all that back and forth? She gave none and the immigration judge noted it. She was unable to explain it. She said nothing. She said nothing. Now, on petition to review to this court, she said, I was confused, but that wasn't before the immigration judge or the board and it was never raised to either. At any rate, as Yorana has pointed out, saying something does not necessarily mean it's true. It doesn't compel a contrary conclusion. Now, moving back just for a second to the documents, this case is a much stronger case than Angab is for several reasons. The first is that her attorney at the hearing was given more than ample time to contest these was on the 8th of August in 2003. In 2006 was the next hearing and that's when the investigative report was submitted. He never, from all that time, he never contested. Well, am I right that it was first she didn't know they were false? And that's what she stated, but didn't contest that they were false. And to rebut it, what he did, so he did actually have a chance. He submitted the second set of documents, another police report, another medical record. As I've said earlier, the medical record that she submitted the second time differed from the medical records the first time. It had a different hospital and it had a different date that the elbow was broken. Also, the apostles were false. They were fraudulent according to the forensic report and the forensic report also mentioned these apostles were very similar to ones that they found in a cache of other fraudulent documents from Armenia. The immigration judge considered all that. Now, when she submitted the forensic report, again, the immigration judge, and that by the way happened, she submitted her second set of fraudulent documents on January 26, 2007. She was served with the forensic report on April 14, 2008, and she said, I need a chance to look into this. Her attorney said that. Then on June 13, 2008, her attorney declined to rebut the forensic report. He basically said, I got nothing. It moved on from there. What that says and what that shows us is this is not a due process violation. They were given plenty of time to contest these reports. Now, for instance, on the apostles, they could have gone to a local consulate, an Armenian consulate, with an apostle that wasn't even attached to the actual medical report. They could have said, can you verify, is this an apostle from your government? That would have been one tact of showing, of rebutting the forensic report. Another could have been, she gave no information whatsoever despite being asked, where did you get these reports? At first, she said, I'm not going to tell you because I just won't. The immigration judge then said, you have to tell us or I'm not going to consider them. That's when we finally got out that she got them from some friend. She doesn't know where the friend got them. The friend sent them by what they call gypsy mail through a courier. Who was the courier? We don't know. She doesn't know that. Did the friend obtain the documents herself or did she get them somewhere else? I don't know and I can't ask because I'm afraid. The judge took a look at all that and said, that's just not sufficient to show that you did not have knowledge. Surely, if she got these documents the first time, twice she went back for these documents. She could have gotten a statement from the friend explaining how she received the documents. That would have been another way of rebutting the fraudulent nature or the finding that they were fraudulent. She didn't do any of that. Under these circumstances, this case is in fact stronger than ANGAR. There's no due process violation because she was given so much opportunity to show why the documents weren't fraudulent and yet she didn't do it. Then again, this isn't just fraudulent documents. This was the inconsistencies. When you put them all together, the record certainly does not compel a conclusion that she was credible. That's what the immigration found and we urge the court to not overturn that finding. Subject to your questions, I think that summarizes my argument. We don't have any additional questions. Thank you for your argument. Thank you, Your Honor. It was a pleasant afternoon. Your Honor, the government has referred to the forensics report. That forensic report actually did not say that the documents were fraudulent. They said they could not authenticate it. They said that because there were so many letterheads, to quote, the diversity of forms, letterheads, printing processes, stamp impressions, authorization signatures, handwriting, and typewriting used for many types of locally issued documents. Because of that, they could not even authenticate them. They never said that they were fraudulent documents. They only said that the apostles, Ms. Movsesian told the court so many times that she was afraid to ask. She was afraid for her friends. That's very reasonable when she's fleeing the country. And also, the counsel for the government mentioned that she never explained why her trips, the issue about her trips, differed from her I-589 application. Well, she did explain that her I-589 application was written by a friend in English. There was never the Russian version of it so that we would know whether she actually told them that or not. Because sometimes the friends misunderstand or write stuff in the application that is not necessarily exactly the way it is. So you agree that there's a massive contradiction between the I-589 and her testimony? There was not a massive contradiction. There was just that one little issue about her going back to Armenia and returning to Moscow. And that's not really massive, Your Honor. And that doesn't really bolster her claim. One trip back, a short trip back, doesn't mean that she's not afraid to go back to Armenia today. And counsel also mentioned that the fact that why would the government want her to come and testify about a case that had already been closed against Mr. Arkady Vartanyan? Mr. Arkady Vartanyan was a very well-known politician and he was a threat to the Armenian government. He could have come back. We don't know why they wanted testimony against him. Maybe they wanted to make sure that he never comes back to challenge the government authorities. So Ms. Movsesian should not be expected to answer that question. She doesn't know what's in the minds of the Armenian authorities for that particular reason. So the fact that she didn't answer does not mean that she's unable to provide explanation. As for her knowledge that the documents were fraudulent, if she had known, why would she submit a second set of documents? She clearly relied on other people. She just called and said, can you send me some more documents? And they went to the same places and they got the same documents. Perhaps the Armenian government was deliberately issuing these documents so that she wouldn't be able to prove her case. So, well, never mind. All right. You're just about out of time. So please conclude your remarks. We just wanted to say that the judge in this case did not have sufficient reason to believe that Ms. Movsesian was not credible and therefore the credibility finding should be reversed. Okay. Thank you for your argument. This matter will stand submitted.
judges: Bennett, TROTT, CALLAHAN